# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| READA COLLINSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:06-0073 |
| v. | ) | Senior Judge Thomas A. Wiseman, Jr. |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 14-1. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 20.

For the reasons stated below, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED, and the decision of the Commissioner will be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her application for Supplemental Security Income ("SSI") benefits on January 31, 2003, alleging that she had been disabled since September 1, 2000, due to recurring back pain, depression, and anxiety. *See, e.g.,* Docket Entry No. 10 ("TR"), pp. 13, 64, 105. Plaintiff's application was denied both initially (TR 23-25) and upon reconsideration (TR 28-29).

Plaintiff subsequently requested (TR 30) and received (TR 40-43) a hearing. Plaintiff's hearing was conducted on February 25, 2005, by Administrative Law Judge ("ALJ") Linda Gail Roberts. TR 302. Plaintiff and Vocational Expert, Rebecca Williams, appeared and testified. TR 302-303.

On November 2, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 10-21. Specifically, the ALJ made the following findings of fact:

1. The claimant has not engaged in substantial gainful activity since she filed her SSI application on January 31, 2003.

2. The claimant has a combination of impairments considered "severe," which includes lumbar degenerative disc disease, post traumatic stress disorder and substance abuse.

3. This combination of impairments does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant has the residual functional capacity to perform medium work activity, i.e., lifting and/or carrying of 25 pounds frequently and 50 pounds occasionally; and standing and/or walking six hours during an eight hour workday; which would accommodate moderate limitations in the ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting.

6. The claimant is not disabled, even considering substance abuse.

7. The claimant is 58 years old and was 55 years old when she filed her current SSI application on January 31, 2003.

8. The claimant has a high school equivalence education.

9. The claimant can perform all past relevant work.

10.     The claimant has been "not disabled," as defined in the Act, since she filed her SSI application on January 31, 2003.

TR 20-21.

On December 31, 2005, Plaintiff timely filed a request for review of the hearing decision. TR 8.  On March 22, 2006, the Appeals Council issued a letter declining to review the case (TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to recurring back pain, depression, and anxiety.  TR 98, 105.

On February 15, 1983, Plaintiff met with Dr. Robert G. Drake for a follow-up examination after being treated in the emergency room for a radial fracture with minimal displacement.  TR 256.  Dr. Drake noted that Plaintiff reported no pain after receiving an injection in the emergency room, and that she had done "fairly well" with a splint.  *Id.*  Dr. Drake prescribed Zomax and advised her to return in two weeks for another examination.  *Id.*

On March 1, 1983, Plaintiff met with Dr. Drake for a re-check of her radial fracture.  TR 256.  Dr. Drake reported that Plaintiff had been wearing a cast and had good alignment.  *Id.*  He noted that Plaintiff should return in two weeks for cast removal.  *Id.*

On March 15, 1983, Plaintiff returned to see Dr. Drake for cast removal, but Dr. Drake noted that Plaintiff's x-rays showed "comminuted intraarticular distal radial fracture," and that

Plaintiff did not exhibit good callus formation. TR 255. Dr. Drake re-splinted her arm and noted that Plaintiff should return in two weeks for a re-examination. *Id.*

On April 4, 1983, Plaintiff returned to Dr. Drake for a re-check of her fracture. TR 254. Plaintiff's x-rays revealed that the fracture was healing well, and Dr. Drake removed Plaintiff's splint. *Id.* Dr. Drake opined that Plaintiff could go back to work but should not engage in any heavy lifting. *Id.*

On July 6, 1990, Plaintiff visited Dr. P. Anderson, complaining of continued pain after dropping a gallon can of vegetables on her right wrist while at work. TR 252. Plaintiff's physical examination revealed no obvious injury or lesions on the right wrist, but Dr. Anderson noted tenderness along the flexor tendons of Plaintiff's right thumb.[1] *Id.* X-rays were taken, which revealed no obvious fractures. *Id.* Dr. Anderson then prescribed Orudis, recommended passive range of motion exercises, and referred Plaintiff to Dr. Larsen. *Id.*

On July 20, 1990, Plaintiff was examined at Trover Clinic by Dr. Ferris Larsen. TR 251. Dr. Larsen's physical examination revealed mild extensor muscle tightness, tenderness adjacent to the intersection point, mostly over the muscle bellies of the abductor pollicis longus, and extensor pollicis brevis. *Id.* Dr. Larsen noted that Plaintiff's Finkelstein's test was positive for pain in the muscle area, but not in the first extensor compartment, that Plaintiff's reverse Finkelstein's test was negative, and that all other stress tests were negative. *Id.* Dr. Larsen prescribed Voltaren, administered a steroid injection at the injury point, and recommended stretching exercises, a thumb splint, and occupational therapy with muscle massage. *Id.* Finally, Dr. Larsen noted that the x-rays taken by Dr. Anderson did not show arthritis or acute injuries. *Id.*

---

[1]All references to Plaintiff's thumb are to her right thumb.

On August 13, 1990, Plaintiff visited Dr. B. A. MacDougal, complaining of stiffness, pain, and weakness in the digital extensors. TR 249. Plaintiff's physical examination revealed percussion tenderness over the first extensor compartment, positive Finkelstein's test, positive reverse Finkelstein's test, and extension of the thumb with palpable and sometimes audible triggering. *Id.* Dr. MacDougal recommended that Plaintiff continue her stretching exercises and splinting, and administered a steroid injection in the first extensor compartment. *Id.*

On August 20, 1990, Plaintiff saw Dr. MacDougal, reporting that her thumb felt "a lot better" and that she could stretch it. TR 248. Dr. MacDougal found, however, that she still had very palpable crepitance at the first extensor compartment. *Id.* Dr. MacDougal recommended that Plaintiff undergo a surgical release because of the high probability that her symptoms would return with just conservative therapy. *Id.*

On September 7, 1990, Plaintiff again saw Dr. MacDougal, who reported that Plaintiff felt "much better" and was not having any symptoms in her forearms. TR 248. Dr. MacDougal also noted that Plaintiff had increased her activity and could return to work with no restrictions. *Id.*

On November 13, 1990, Plaintiff met with Dr. MacDougal, complaining of aching and pain in the radial portion of her right wrist. TR 248. Plaintiff reported that she was no longer working and denied any really strenuous activity. *Id.* Plaintiff's physical examination revealed warmth over the De Quervain's area, right wrist, some swelling, tenderness to palpation, positive Finkelstein's test, and positive reverse Finkelstein's test. *Id.* Dr. MacDougal recommended a steroid injection, splinting, stretching exercises, and a probable De Quervain's release. TR 247.

On November 23, 1990, Plaintiff met with Dr. MacDougal, who noted that Plaintiff had a very palpable large first extensor compartment. TR 247. Dr. MacDougal recommended that

Plaintiff undergo a De Quervain's release, and he reviewed the surgery and its complications with her. *Id.* That same day, Dr. MacDougal performed a release of Plaintiff's right De Quervain's bicameral compartment. *Id.*

Ten days later, on December 3, 1990, Plaintiff again visited Dr. MacDougal. TR 246. Dr. MacDougal noted that Plaintiff was "symptomatically better but still a little tight." *Id.* Dr. MacDougal also noted that Plaintiff was experiencing some numbness distal to the incision, and recommended that Plaintiff continue her exercises, but that she should perform them gently. *Id.*

On December 17, 1990, Plaintiff visited Dr. MacDougal, who noted that Plaintiff was "doing nicely" following her De Quervain's release. TR 246. Dr. MacDougal reported that Plaintiff needed stretching, strengthening, and deep massage, and recommended that Plaintiff apply Coban and Reston over her wound at night and during the day. *Id.*

On January 14, 1991, Plaintiff visited Dr. MacDougal, complaining that she continued to have aching and pain in her hand, although it had "substantially changed," and that she continued to have swelling with stretching. TR 246. Dr. MacDougal noted that it was time to start considering Plaintiff's return to work and vocational rehabilitation. *Id.* Dr. MacDougal recommended that Plaintiff continue her stretching exercises and gradually transfer to a home exercise program. TR 245-246. Dr. MacDougal also limited Plaintiff to jobs with no constant, rapid, or repetitive activity and no frequent lifting of more than 10 to 15 pounds. TR 245.

On February 11, 1991, Plaintiff visited Dr. MacDougal, complaining of a little bit of numbness in her hand. TR 245. Plaintiff's physical examination revealed a lot of tenosynovitis. *Id.* Dr. MacDougal recommended more stretching, and fascial releases. *Id.* He further recommended that Plaintiff begin formal hand therapy. *Id.* Dr. MacDougal opined that Plaintiff's condition was "probably not severe enough to require a disability but restrictions

[were necessary] as noted." *Id.* Dr. MacDougal added, "Patients who get back to work are much better off and can function at a much higher level a year after their surgery than those who do not." *Id.*

On February 25, 1991, Plaintiff visited Dr. MacDougal, complaining of post-exertional aching pain and swelling. TR 244. Plaintiff's physical examination revealed a good range of motion, with some discomfort extending from the thumb to the mid forearm, and mild palpable chronic tenosynovitis. *Id.* Dr. MacDougal advised Plaintiff to begin a lighter job, with the restrictions he had discussed on January 14. *Id.*

On March 14, 2001, Plaintiff met with Dr. MacDougal, who noted that Plaintiff was symptomatically unchanged. TR 244. Dr. MacDougal strongly urged Plaintiff to get back to work at a job that she could tolerate, since complete relief of her discomfort was unrealistic, and since "people who get back to work, even though their hand still bothers them, will be better off a year from now than those people who don't." *Id.*

On August 27, 1991, Plaintiff met with Dr. MacDougal, complaining of use-related discomfort and loss of strength and endurance. TR 243. Plaintiff reported that she had worked cleaning at a motel and making pizza dough since she had last seen him, but that she had lost both of those jobs because she was not fast enough and she lacked the strength and endurance for them. *Id.* Plaintiff's physical examination revealed a full range of motion, discomfort with extremes, good release at the first extensor compartment, no swelling, and no positive evocative test. *Id.* Dr. MacDougal advised Plaintiff to get a job that involved using her hands only intermittently, noting that aggressive medical or therapeutic care would not be sufficiently worthwhile. *Id.*

On February 3, 2003, Plaintiff met with Dr. F. Hanke, complaining of congestion, runny

nose, and pain in her right shoulder. TR 242. Dr. Hanke assessed Plaintiff with a URI and bursitis of the right shoulder, and prescribed Ansaid, Codimal, and Mylanta or Maalox. *Id.*

On February 17, 1993, Plaintiff visited Dr. Hanke, complaining of increased pain in her right shoulder and neck pain. TR 241. Plaintiff's physical examination revealed no C-spine tenderness, a mild muscle spasm on her right superior trapezius muscle, and pain on the internal rotation and abduction of Plaintiff's right shoulder. *Id.* Dr. Hanke prescribed Kenalog, Flexeril, Ansaid, and Tylenol, and advised Plaintiff to follow up if she did not improve. *Id.*

On January 18, 1997, Plaintiff visited Dr. William H. Clapp, complaining of pain in her back and head. TR 240. Dr. Clapp reported that Plaintiff had slipped and hit the back of her head while delivering newspapers, resulting in loss of consciousness "for a few seconds." *Id.* Plaintiff received x-rays and a CT scan, the results of both of which were negative. *Id.* Dr. Clapp prescribed Relafen and recommended Tylenol, a "head sheet," cool packs on and off for the first 48 hours, and a gentle range of motion. *Id.*

On January 29, 1997, Plaintiff visited Dr. Gaines E. Richardson, complaining of continued pain in the lumbar area, right shoulder, and neck, accompanied by frequent headaches. TR 239. Plaintiff's physical examination revealed tenderness in the right shoulder, the lumbar area, and the paraspinous muscles of the thoracic and cervical region. *Id.* Dr. Richardson observed that Plaintiff was "very apprehensive about having the area touched at all and seems to exaggerate her symptoms somewhat." *Id.* Dr. Richardson prescribed Ultram and Elavil, and recommended physical therapy to improve Plaintiff's strength, decrease her pain, and increase her range of motion. *Id.*

On February 19, 1997, Plaintiff visited Foundation Sports Medicine and Rehabilitation to receive treatment. TR 238. Plaintiff's treatment consisted of "positioning in a supine position

with [a] towel on [her] thoracic spine to promote stretching to the anterior shoulder region and provide mobilization to the thoracic spine," along with various aquatic therapy and stretches. *Id.* Plaintiff terminated her treatment at the end of that session. *Id.*

On February 21, 1997, Plaintiff visited Dr. Richardson for a follow-up examination. TR 236. Dr. Richardson reported that Plaintiff reported feeling better and doing her physical therapy, resulting in improvements in her back and neck pain. *Id*. Dr. Richardson noted that Plaintiff still experienced some limitations when turning and looking over her right shoulder, but that the therapy "had helped quite a bit." *Id*. Dr. Richardson recommended that Plaintiff stop taking Ultram, start taking Tylenol, continue taking Naprosyn, and continue her physical therapy for a few more weeks. *Id.*

On November 29, 1997, Plaintiff met with Dr. Kristy Wells for her yearly pap smear, and also complaining of back pain. TR 235. Plaintiff reported that her back pain had been present since January, when she fell while delivering newspapers. *Id*. Plaintiff's physical examination revealed slight swelling over the mid-lumbar area of the back and a somewhat tender area in the center. *Id.* Plaintiff's straight leg raising test was positive at about 60 degrees with raising of the left leg. *Id.* Dr. Wells noted that Plaintiff had a full range of motion, but was stiff when bending her back. *Id.* Dr. Wells also performed Plaintiff's annual gynecologic exam. *Id.* Dr. Wells diagnosed a possible disc herniation in Plaintiff's back and ordered an MRI to confirm this potential diagnosis. *Id.*

On May 24, 1998, Plaintiff met with Dr. Jeremy Bradley, complaining of a headache. TR 234. Plaintiff described the pain to Dr. Bradley as "throbbing associated with photophobia, phonophobia, nausea, and vomiting." *Id.* Dr. Bradley diagnosed Plaintiff with migraine and tension headaches, and prescribed moist heat, rest, massaging the back of the neck, and Midrin.

*Id.*

On January 21, 2000, Plaintiff visited Dr. Robert A. Grummon, complaining of back pain and resulting numbness and tingling in both her legs. TR 166-167. Dr. Grummon's impressions of Plaintiff included chronic back pain with radiculitis, excessive smoking with symptoms of chronic bronchitis, and pain in the neck which was aggravated by moving. TR 166. Dr. Grummon ordered a CBC, metabolic and lipid profile, and x-rays of Plaintiff's lumbar spine, cervical spine, and chest. *Id.* Dr. Grummon prescribed Lortab and indicated that Plaintiff would probably need an MRI after reviewing the reports of her "plain films." *Id.*

On January 27, 2000, Plaintiff met with Dr. Grummon to discuss her test results. TR 166. Dr. Grummon reported that x-rays of Plaintiff's cervical spine revealed minimal cervical spine degenerative change, while x-rays of her lumbar spine revealed mild degenerative change. *Id.* He also noted that Plaintiff's chest x-ray was "all right." *Id.* Dr. Grummon ordered an MRI of Plaintiff's lumbar spine in order to rule out spinal stenosis. *Id.*

On February 2, 2000, Dr. John Bartek reported the results of Plaintiff's lumbar spine MRI. TR 226. Plaintiff's MRI revealed changes of spinal stenosis at L4-L5, mild subligamentous disc bulging, especially at L4-L5, and lesser changes at L3-L4 and L5-SI. *Id.*

On March 8, 2000, upon referral from Dr. Grummon, Plaintiff visited Neurological Associates and saw Dr. William R. Schooley. TR 156. Plaintiff complained of severe back and left leg pain, pain in her left shoulder, and pain in the base of her neck. *Id.* Dr. Schooley diagnosed Plaintiff with mild lumbar stenosis and cervical spasm with possible cervical radiculopathy. *Id.* Dr. Schooley ordered a myelogram of Plaintiff's cervical and lumbar spine. *Id.*

On August 10, 2000, Plaintiff visited Dr. Grummon for a pap smear and mammogram.

TR 165.  Dr. Grummon noted that Plaintiff was "a little bit histrionic in her description of her symptoms."  *Id.*  He explained, "For example, she indicates that something that [*sic*] affected her entire arm when it turned out to only involve a two-inch segment of her wrist."  *Id.*  Dr. Grummon also noted that Plaintiff had "neglected to tell Dr. Schooley that she was allergic to the dye [used in a mylegram], and simply never got the mylegram," which "left Dr. Schooley in an awkward position."  *Id.* Dr. Grummon referred Plaintiff to Dr. Prakash, a physiatrist, to meet with her regarding her possible need for surgery.  *Id.*

On December 27, 2000, Plaintiff met with Dr. Grummon, complaining of lumbar pain that radiated across her abdomen and into her legs.  TR 164-165.  Dr. Grummon noted that Dr. Prakash did not find any peripheral nerve damage and recommended that Plaintiff see an orthopedist or "similar type person" regarding the lumbar stenosis.  TR 165.  Dr. Grummon noted that Plaintiff's back was "a bit stiff, particularly in extension," but that there was no particular focal tenderness.  *Id.*  Dr. Grummon opined that Plaintiff's lumbar stenosis was "relatively mild and possibly the physical dimensions of the problem are not impressive to the consultants."  TR 164.  Dr. Grummon noted Plaintiff's cold, pink feet and epigastric symptoms, and recommended that Plaintiff stop taking Naprosyn, try taking Zantac, and continue taking Darvocet.  TR 164.

On July 9, 2001, Plaintiff met with Dr. Grummon, who noted that Plaintiff was "more frightened of the myelogram dye than she is worried about the pain in her back and so she has put her back problems on hold."  TR 164.  Dr. Grummon reported that Plaintiff had stopped taking her Prempro; he started her on Evista.  *Id.*

On October 18, 2001, Plaintiff met with Dr. Grummon, complaining of persistent back pain.  TR 163.  Plaintiff also complained of panic attacks while driving and some rhinorrhea

resulting from her allergies. *Id.* Dr. Grummon noted that Plaintiff had previously demonstrated lumbar stenosis, but that "the work up of this condition has stalled over the issue of a myelogram." *Id.* Dr. Grummon prescribed Valium, Darvocet, and Benadryl. *Id.*

On March 1, 2002, Plaintiff visited Dr. Grummon, needing refills of Evista, Valium, and Darvocet. TR 163. Dr. Grummon noted that Plaintiff's back pain was improving with Valium. *Id.* Dr. Grummon also noted Plaintiff's abusive childhood and abusive marriage, both of which he reported have left emotional scars. *Id.*

On September 24, 2002, Plaintiff visited Dr. Grummon, needing refills of her medications, but otherwise reporting that she was doing well. TR 161. Dr. Grummon continued her Valium, Darvocet. Benadryl, and Evista, and also prescribed Flonase as a potentially more effective alternative to Benadryl. *Id.*

Plaintiff did not come to her scheduled appointment on October 1, 2002. TR 161.

On October 17, 2002, Plaintiff visited Dr. Grummon, who refilled Plaintiff's prescriptions of Valium and Darvocet. TR 161. Dr. Grummon reported that Plaintiff's biggest problem was her "emerging sense of the enormity of the childhood incest that she experienced at the hands principally of her stepfather," who "apparently finally died recently." *Id.* Dr. Grummon strongly urged Plaintiff to go to the mental health center to talk about these things. *Id.*

On November 12, 2002, Plaintiff met with Dr. Grummon and reported that Nexium, which Plaintiff had requested on November 5, was "work[ing] beautifully for her." TR 160-161. Dr. Grummon gave Plaintiff more samples of this drug. TR 160.

On December 3, 2002, Plaintiff met with Dr. Grummon, who noted that, after "throwing firewood around," Plaintiff had sustained a pain in her left anterior chest that was centered on a little depression on a rib. TR 160. Dr. Gammon noted that the area was "quite tender" and

opined that Plaintiff might have a stress fracture.  *Id.*  He put in an intercostal block and noted that it was "completely effective" in relieving Plaintiff's pain.  *Id.*  Dr. Grummon prescribed Lortab and a rib binder, as well as Caltrate with vitamin D on a regular basis.  *Id.*

On April 4, 2003, DDS Examiner Gay Davis performed Plaintiff's clinical interview and mental status examination, which was reviewed and reported on by Eugene Smith, M.A., on April 17, 2003.  TR 168-171.  Mr. Smith reviewed Plaintiff's medical history and activities of daily living.  TR 168-170.  With regard to her activities of daily living, Plaintiff reported that she did not do "anything"; specifically, that she did not socialize, did not go out unless it was with her husband, and did not go to church or involve herself in social activities, because she did not like to be around people.  TR 170.  Plaintiff reported that she did go shopping at places such as Wal-Mart and the grocery store, and that her only friends were friends of her husband.  *Id.*  Plaintiff also reported that she read newspapers and books, watched television, and ate meals prepared by her husband.  *Id.*  Plaintiff reported that she could care for herself with regard to personal hygiene, and that she usually went to bed around 10 pm, but did not rest well and was "up and down most of the night because of pain."  *Id.*  Mr. Smith observed that Plaintiff's immediate, recent, and remote memory were intact, and that Plaintiff's thought processes were logical and sequential with no tangential thinking.  *Id.*

Plaintiff reported feeling hopeless, helpless, and worthless, partly due to her physical pain and financial distress, but she denied current suicidal ideations, which Mr. Smith noted was a valid assessment of her then-current mental status functioning.  TR 171.  Mr. Smith diagnosed Plaintiff with anxiety disorder and borderline personality disorder.  *Id.*

With regard to Plaintiff's ability to do work-related activities, Mr. Smith noted that Plaintiff had "sufficient ability to focus her attention and concentration in order to complete

several step task duties." TR 171. Mr. Smith noted that Plaintiff did not have any significant history of vocational training and was therefore limited to unskilled labor type positions. *Id.* Mr. Smith noted Plaintiff's view of herself as helpless, and observed that she was functioning "as well as possible" in the low average range of intelligence. *Id.* Mr. Smith opined that Plaintiff would have difficulty in the general work force because of her anxiety and personality disorders, but that she would function well at solitudenous tasks in which she had simple, repetitive jobs to complete. *Id.*

On April 8, 2003, Plaintiff visited Dr. Grummon for an examination regarding her application for disability. TR 213. Dr. Grummon recounted that Plaintiff and her husband had encountered "a lot of trouble all at the same time," including having trouble with real estate, receiving poor legal advice, being sued by the husband's son, being disliked by the neighbors, being threatened with the loss of their house, and possibly having to declare bankruptcy. *Id.* Dr. Grummon noted that neither Plaintiff nor her husband had worked "in a while," and that they were angry and blaming "things on people." *Id.* Dr. Grummon noted that "one of them is planning to divorce the other so that she can separate herself from the bankruptcy relating to the son's lawsuit." *Id.* He opined, "Most of this state of uproar has nothing to do with any disabilities and pretty much has all to do with decisions that they have made, wittingly or unwittingly, and things have happened around and to them." *Id.*

Upon examination, Dr. Grummon opined that Plaintiff "probably does hurt and is probably nervous and that she certainly seems to have gotten herself into a lot of trouble with unwise business deals." TR 212. Dr. Grummon also noted that Plaintiff had no income and was experiencing a lot of discord with her family, but stated, "just how much of this is related to intrinsic illness and how much is just poor management and planning I do not know." *Id.* Dr.

Grummon increased Plaintiff's Valium, prescribed Lortab, and granted her request for a back brace. *Id.*

On April 17, 2003, Plaintiff visited the Volunteer Behavioral Health Care System (VBHCS) and met with Ms. Myrna Brill, complaining of being nervous, sleeping only 2-3 hours per night, having bad dreams and flashbacks from her abusive childhood and marriage, becoming easily frustrated, crying easily, and being angry towards her stepfather and mother. TR 184. After reviewing Plaintiff's history, Ms. Brill diagnosed Plaintiff with chronic posttraumatic stress disorder with severe levels of distress and impairment, and recommended individual therapy and counseling along with medication management. TR 188.[2]

On April 29, 2003, Dr. Victor O'Bryan completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment (RFC) regarding Plaintiff. TR 172-179. Dr. O'Bryan diagnosed Plaintiff with anxiety and borderline personality disorder. TR 173-174, 176. Dr. O'Bryan noted moderate limitations in Plaintiff's ability to maintain social functioning, concentration, persistence, and pace, and a mild limitation Plaintiff's activities of daily living. TR 175.

In his Mental RFC Assessment, Dr. O'Bryan opined that Plaintiff experienced moderate limitations in her abilities to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions, interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. TR 177-178. Dr. O'Bryan further opined that Plaintiff would do better in work settings with few social demands, and would work better with things, as opposed to people. TR 179. Dr. O'Bryan also opined that Plaintiff

---

[2]Plaintiff continued to visit VBHCS from April 2003 February 2005, with very little change in her condition.

could adapt to mild to moderate levels of stress and change.  *Id*.

On May 12, 2003, Plaintiff returned to the VBHCS and met with Ms. Brill.   TR 183.
Ms. Brill reported that Plaintiff spent most of this session discussing sexual things that had
happened to her as a child, and Plaintiff complained of ongoing flashbacks, lack of sexual
interest, and other depressive symptoms.  *Id*.  Ms. Brill noted that Plaintiff's affect was fair, that
she was having no suicidal or homicidal ideations, and that she was making progress toward her
goals. *Id.*

On May 20, 2003, DDS Medical Consultant Dr. Robert E. Burr assessed that Plaintiff's
physical impairments were not severe, singly or combined.  TR 180.

On May 27, 2003, Plaintiff again returned to the VBHCS and met with Ms. Brill.  TR
183.  Ms. Brill noted that Plaintiff suffered from a sad affect but experienced no suicidal or
homicidal ideations.  *Id.*  Ms. Brill advised Plaintiff that she must "cope with [her] anger in order
to get on with [her] life," and noted that Plaintiff was making progress toward her goals.  *Id*.

On June 11, 2003, Plaintiff again saw Ms. Brill at the VBHCS.  TR 182.  Ms. Brill noted
that Plaintiff was "very frustrated over leaving the home [her] husband built and moving into an
[apartment]."  *Id*.  Ms. Brill also noted that Plaintiff's affect was fair, that she was experiencing
no suicidal or homicidal ideations, and that she was making progress toward her goals.  *Id.*

On July 22, 2003, Dr. Frank Kupstas completed a Psychiatric Review Technique form
and a Mental RFC Assessment regarding Plaintiff.  TR 190-199.  In his Psychiatric Review
Technique form, Dr. Kupstas diagnosed Plaintiff with anxiety and borderline personality
disorders with mild to moderate restrictions of activities of daily living, and moderate restrictions
in maintaining social functioning, concentration, persistence, or pace.  TR 191-192, 194.

In his Mental RFC Assessment, Dr. Kupstas opined that Plaintiff was moderately limited

in her abilities to maintain attention and concentration for extended periods and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. TR 197. He further opined that Plaintiff was moderately limited in her abilities to: complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. TR 198. Dr. Kupstas noted that Plaintiff was able to remember and carry out simple instructions and would have difficulty at times with detailed instructions but could still complete them. TR 199. Dr. Kupstas further opined that Plaintiff would have difficulty interacting with the general public at times but could still do it. *Id.*

On July 29, 2003, Plaintiff visited Dr. Grummon, who noted that Plaintiff was much calmer. TR 211. Dr. Grummon refilled Plaintiff's prescriptions for Valium, Premarin, and Darvocet. *Id.*

On September 4, 2003, Plaintiff visited VBHCS and met with Ms. Mary Rutherford, who reviewed Plaintiff's history in detail. TR 258. Plaintiff's mental status exam revealed anxious behavior, hallucinations, depressed and anxious mood, agitation, fair recent memory, poor remote memory, fair concentration, and impaired insight, judgment, and impulse control. TR 259. Ms. Rutherford diagnosed Plaintiff with chronic post-traumatic stress disorder, alcohol abuse, and a then-current GAF of 30. *Id.* Ms. Rutherford started Plaintiff on a trial of Zyprexa and referred her back to Dr. Grummon for a bone density test. *Id.*

On September 19, 2003, Plaintiff visited Dr. Grummon, needing refills for her Valium and Darvocet. TR 211. Dr. Grummon noted that Plaintiff had recurring nightmares and dreams,

was "volatile and histrionic," had "strong anger," and had trouble functioning in groups of people, but was "not out in left field." *Id.* Dr. Grummon reported that he would perform the bone density test requested by Ms. Rutherford. *Id.*

On November 3, 2003, Plaintiff met with Dr. Grummon, who listed Plaintiff's then-current medications as Benadryl, Darvocet, Evista, Valium, and Fosamax. TR 210. Dr. Grummon opined that Plaintiff was "very frail" and had arthritic changes in her hands and back, some peripheral neuropathy, poor peripheral circulation and emphysema. Although she got short of breath "very easily," she continued to smoke, was "terribly disabled by her emotional status," fell "frequently," and had balance problems. *Id.* Dr. Grummon noted that Plaintiff's "principal pain symptoms relate to her back which is effected [*sic*] by all sorts of motions." *Id.*

On November 7, 2003, Plaintiff returned to the VBHCS and met with Ms. Rutherford. TR 261. Ms. Rutherford rated Plaintiff's anxiety and depression as moderate. *Id.* Plaintiff's mental status exam revealed an intense affect, slow speech/thought process, delusions, hallucinations, and mildly impaired memory/orientation. *Id.* Ms. Rutherford diagnosed Plaintiff with chronic post-traumatic stress disorder and alcohol abuse, and noted that Plaintiff was to continue counseling. *Id.*

On February 17, 2004, Plaintiff visited Dr. Grummon for a complete physical with yearly pap smear. TR 209. Plaintiff complained of cold feet, a persistent cough, and some pelvic pain aggravated by bowel movements. *Id.* Dr. Grummon observed that Plaintiff had "weak pulses in her legs," and had cold and blue feet, but no dorsalis pedis pulses or edema. TR 208. Dr. Grummon arranged a mammogram and a chest x-ray, and prescribed Pletal. *Id.* Dr. Len Goodin of Macon County General took Plaintiff's chest x-rays and performed her mammogram. TR 224-225. Plaintiff's chest x-rays revealed hyperinflation and prior granulomatous changes, and

her mammogram revealed benign findings.  *Id.*

On March 5, 2004, Plaintiff visited VBHCS and met with Ms. Rutherford.  TR 263.  Ms. Rutherford again assessed Plaintiff's anxiety and depression as moderate.  *Id.*  Plaintiff's mental status exam revealed an intense affect, logical speech/thought process, phobias, and hallucinations.  *Id.*  Plaintiff reported that her counseling had been helping, but that she was experiencing more anxiety attacks.  *Id.*  Ms. Rutherford opined that Plaintiff was making progress toward her goals and that there had been a slight improvement in Plaintiff's level of functioning.  TR 264.  Ms. Rutherford increased Plaintiff's dosage of Zyprexa, and advised Plaintiff to remain substance free and continue counseling.  *Id.*

On April 30, 2004, Plaintiff visited VBHCS and met with Ms. Rutherford, reporting that she was having fewer nightmares, but still had anxiety attacks.  TR 265. Plaintiff also reported that she "knows she is getting better."  *Id.*  Plaintiff' mental status exam revealed an intense affect, logical thought process, and phobias*.  Id.*  Ms. Rutherford continued Plaintiff's Zyprexa, cautioned Plaintiff about the dangers of drinking with her medications, and advised her to continue her counseling.  TR 266.

On Mary 24, 2004, Plaintiff returned to Dr. Grummon, who noted that Plaintiff was depressed and that her mood disorder questionnaire strongly suggested bi-polar disorder.  TR 208.  Dr. Grummon started Plaintiff on Lexapro, and continued her Premarin and Zyprexa.  *Id.*

On July 9, 2004, Plaintiff visited VBHCS and met with Ms. Rutherford, reporting that her nerves had gotten worse, that she had been drinking again and having dreams about her past abuse by her stepfather, and that she was "very paranoid about others doing things against her."  TR 267.  Plaintiff said that she did not think that she could stop drinking but she "declined going into detox."  *Id.*  Plaintiff's mental status exam revealed an intense affect, a labile range of affect,

a flight of ideas, phobias, and mildly impaired memory/orientation. *Id.* Ms. Rutherford noted an imminent risk of violence when Plaintiff drank. *Id.* Ms. Rutherford noted that progress was made towards Plaintiff's goals, continued Plaintiff's Zyprexa, counseled Plaintiff to remain substance free, cautioned Plaintiff again about the dangers of drinking and taking her medication, and advised Plaintiff to continue counseling. TR 268.

Also on July 9, 2004, Plaintiff visited Dr. Grummon, needing refills of her medications, which included Wellbutrin, Valium, Darvocet, Pletal, Lexapro, Evista, and Premarin. TR 207. Plaintiff was also worried about the circulation in her legs. *Id.*

On August 10, 2004, Plaintiff visited Dr. Grummon, complaining that she thought she was yellow in color and wanting her liver checked. TR 207. Dr. Grummon noted that Plaintiff was "functioning about the way she usually does" and was "still bipolar."[3] *Id.*

On September 10, 2004, Plaintiff visited VBHCS and met with Ms. Rutherford, reporting that she had been "sleeping better," but having "pretty weird nightmares." TR 269. Plaintiff's mental status exam revealed an intense affect, narrow range of affect, logical speech/thought process, delusions, phobias, and mildly impaired memory/orientation. *Id.* Ms. Rutherford noted Plaintiff's imminent risk of violence when she was drinking, and noted Plaintiff's report that she had been drinking with her husband and family members and some of the family members had beaten her up. *Id.* Plaintiff reported that she wanted to change her medication; Ms. Rutherford gave Plaintiff a trial of Risperdal and advised her to taper off of Zyprexa. TR 270. She again cautioned Plaintiff about the dangers of drinking and taking her medication, and further cautioned her about starting Wellbutrin without telling Dr. Grummon how often she was drinking. *Id.* Plaintiff was to continue counseling. *Id.*

---

[3]Much of this record is illegible.

On November 5, 2004, Plaintiff returned to VBHCS and met with Ms. Rutherford, reporting that she was "doing better" and feeling "less depressed" and "less irritable" since she cut back her drinking to 4-5 beers once a week, got a dog, and started working with her husband to sell some of their things at the Flea Market. TR 271. Plaintiff reported that she had "less nightmares," was "sleeping better," had an increased appetite, and had "cut back on her smoking." *Id.* Plaintiff's mental status exam revealed a normal affect, logical thought process, phobias, and a mildly impaired memory/orientation. *Id.* Ms. Rutherford continued Plaintiff's medications and advised her to continue counseling. TR 272.

On December 10, 2004, Plaintiff visited Dr. Grummon complaining of upper and lower back pain. TR 206. Dr. Grummon noted that Plaintiff was "getting a little dingy," and that she had reduced her smoking by half. *Id.* Dr. Grummon refilled Plaintiff's Wellbutrin, Valium, Darvocet, Pletal, Lexapro, Evista, Premarin, and Aciphex. *Id.*

On December 30, 2004, radiologist Dr. M.A. Todd performed a lumbar spine AP and lateral views on Plaintiff at Macon County General Hospital. TR 233. Dr. Todd reported marked degenerative changes at the L5-SI level with facet joint sclerosis. *Id.* Dr. Todd also noted that spinal stenosis at the L5-SI level should be considered. *Id.*

Plaintiff also saw Dr. Grummon on December 30, 2004. TR 206. Dr. Grummon noted that Plaintiff was under a lot of stress and confusion at home because her son had come back, which created "enormous conflict" between the son and the husband, such that Plaintiff flew into rages. *Id.* Dr. Grummon observed that Plaintiff did not handle conflict well and did not take responsibility. *Id.*

Additionally on December 30, 2004, Dr. Grummon completed a Medical Source Statement of Physical Ability to do Work-Related Activities form regarding Plaintiff. TR 201-

204.   Dr. Grummon opined that, based upon Plaintiff's own statements, Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk for less than 2 hours in an 8-hour workday, sit less than 6 hours in an 8-hour workday, and was limited in both her upper and lower extremities in her abilities to push and/or pull.  TR 201-202.  Dr. Grummon also opined that, based upon Plaintiff's own statements, Plaintiff could occasionally balance, but never climb, kneel, crouch, crawl, or stoop.  TR 202.  Dr. Gummon additionally opined, based upon Plaintiff's own statements, that her handling (gross manipulation) was limited.  TR 203.  Because Plaintiff had cataracts in both eyes, Dr. Grummon opined that Plaintiff's vision was impaired, but he noted that her hearing and speaking were not.  *Id.*  Dr. Grummon further opined, based on Plaintiff's statements, that Plaintiff could never be exposed to temperature extremes, noise, dust, vibrations, humidity, wetness, hazards, fumes, odors, chemicals, and gases.  TR 204.[4]

On January 5, 2005, Dr. Jennifer Y. Hencey performed an MRI of Plaintiff's lumbar spine at Macon County General.  TR 230.  Dr. Hencey reported multi-level degenerative changes that were most prominent at L4-5, where there was moderate canal stenosis and bilateral neural foramen narrowing.  *Id.*

On February 4, 2005, Plaintiff visited VBHCS and met with Ms. Mary Rutherford.  TR 273.  Plaintiff reported feeling "upset with herself for having a short affair" for which she did not think that her husband would forgive her "anytime soon."  *Id.*  She further reported getting upset with two of her friends, and she was afraid that she was going to "blow up, lose control" and ruin their friendship.  *Id.*  Plaintiff reported that she was drinking about 6 beers per week, sleeping "pretty good," eating "the same as she always did," continuing to drink coffee and tea, but was

_____

[4]Dr. Grummon explained that his answers on the form were based upon Plaintiff's personal statements because he did not have the time to test her assertions.  TR 204.

trying to cut down, and continuing to smoke "about the same amount of cigarettes." *Id.* Plaintiff's mental status exam revealed an intense affect, logical thought process, obsessions, compulsions, phobias, and a mildly impaired memory/orientation. *Id.* Ms. Rutherford continued Plaintiff's medications, increased her Risperdal, counseled her about remaining substance free, cautioned her again about the dangers of drinking and taking her medication, and advised her to continue counseling. TR 274.

## B. Plaintiff's Testimony

Plaintiff was born on May 3, 1947, and has an eighth grade education. TR 305. Plaintiff testified that she then received her GED in 1962 and has no vocational training. TR 306.

Plaintiff testified that her disability began on September 1, 2000. TR 306. Plaintiff also testified that after her onset date of September 1, 2000, she worked in the deli at Wal-Mart cooking and slicing meat for "about four months." TR 306-307. Plaintiff was unsure whether she worked for Wal-Mart from October 2000 to April 2001 or from October 2001 to April 2002. TR 307-309. Plaintiff testified that she had earned $6.00 an hour during her employment at Wal-Mart and a total of $2,000.00 during the four months. TR 309.

Plaintiff testified that while she was working in the deli department at Wal-Mart, she had fallen once trying to clean a deep fryer, and it landed on her. Plaintiff did not receive worker's compensation for her injury because she did not report the incident. TR 307-308.

Plaintiff testified that in the past fifteen years, she had also worked as a line worker in a factory. TR 309-310. Plaintiff testified that she had worked as a line worker for three weeks in June of 2000, but that she could not do the work because, as a line worker, she had to lift automotive parts and put them on a hook, which caused her severe pain in her back. TR 310. Plaintiff further testified that she had fallen in the parking lot at work as a result of the pain. *Id.*

Plaintiff reported that she did not receive any worker's compensation for this incident and was subsequently fired. *Id.*

Plaintiff testified that she had also worked for U.S. Tobacco, where she did primarily janitor work, but she also worked on the line when necessary. TR 310. Plaintiff testified that as a line worker for U.S. Tobacco, she would lift "little bundles of tobacco and put them on the belt." TR 324.

Plaintiff further testified that she had worked at Best Western cleaning rooms, but that she could not do the work. TR 311. Plaintiff additionally testified that she had worked at a McDonald's for one week, but quit because "the girl" made her "feel stupid," when she is not stupid. TR 324. Plaintiff testified that the last job she had before her onset date was delivering newspapers for the Louisville Courier Journal from August 1, 1991 to May 1, 1998. TR 310-311.

Plaintiff reported that she was unable to return to her work because of her back, which resulted in her sleeping only two hours per night, and because of her inability to sit, stand, and lift. TR 311. Plaintiff testified that she could "lift maybe five pounds." *Id.* Plaintiff testified that she had been seeing Dr. Grummon since 1999 for her back problems. TR 312.

Plaintiff reported that her mental problems also kept her from being able to work. TR 312. Plaintiff testified that, at the time of the hearing, she had been going to a psychiatrist for about a year and a half, seeing specifically Mary Rutherford and Myrna Brill. *Id.*

Plaintiff reported that she had had some problems with drugs and alcohol in the past. TR 313. Plaintiff explained that she had been "practically an alcoholic" when she was approximately 20 years old. *Id.* Plaintiff testified that after her doctor had suggested that she was an alcoholic and that she should see a psychiatrist, she "quit drinking altogether" until she

was 51 years old, when she moved to Tennessee and began having problems with her children. TR 313-314. Plaintiff testified that Ms. Rutherford had put her on a new medication, and that as a result, she did not drink as much and would then occasionally drink about six cans of beer in approximately a five-hour time span. *Id.* Plaintiff testified that she drank only when she got really upset with her children. *Id.* Plaintiff testified that she "cut way down on [her] smoking . . . and [her] drinking" because her doctors had told her that her drinking might interfere with her medications. TR 314.

Plaintiff reported that, at the time of her hearing, her then-current medications were Darvocet for her pain, Valium for her nerves, and Pedatol for her circulation. TR 315. She testified that she formerly took Zyprexa to help her sleep and keep her from losing her temper. *Id.* Plaintiff also reported that she took Benadryl for her allergies, Albuterol for her breathing, and Nasonex for her sinuses. *Id.*

Plaintiff testified that she suffered from back pain that radiated all the way down her left hip into her left thigh and down to her knee. TR 316. Plaintiff testified that this pain was constant, despite her medications, and that she experienced swelling in the middle of her lower back, about the size of half of a softball. TR 316-317.

Plaintiff testified that she also had pain and tingling in her feet, as a result of "poor circulation in [her] legs." TR 317. Plaintiff reported that the tingling was constant, and that the pain and tingling did not change whether she was sitting, standing, or walking. *Id.* Additionally, if she lay down for too long, she became stiff and could not "even get out of the bed." *Id.*

Plaintiff testified that she had experienced episodes of falling because her "legs just go numb." TR 317. As an example, Plaintiff reported that, in 2003, she "was just walking and [her] legs went out" and she fell, fracturing three ribs. *Id.* Plaintiff also reported falling in 2002 when

she was mowing a "little hillside with a self-propelled mower." TR 318. Plaintiff reported that she "had to lay there for at least 45 minutes" awaiting someone to help her, because she had been unable to get herself up as a result of her back problems. *Id.* Plaintiff reported that she had not mowed the yard since that episode. *Id.*

Plaintiff testified that, for her physical problems, she had received two MRIs, chest x-rays, at least one CT scan, and two ultrasounds on her stomach. TR 318-319. Plaintiff also testified that Dr. Schooley had wanted "to run [a] test to see how much nerve damage was done in [her] legs and in [her] back," but that she did not agree to have the test done because she believed herself to be allergic to the dye used in the procedure. *Id.*

Plaintiff reported that on a typical day, she got up at about 6:00 a.m., went upstairs, fixed herself a cup of coffee, sat for approximately an hour, then got up and did the dishes. TR 320. Plaintiff testified that she would prepare oatmeal for breakfast. *Id.* Plaintiff reported that she was unable to take her own shower and care for her own personal needs, and that her husband, Ron, would help her in and out of the bathtub because she had fallen several times since lifting her leg was difficult for her. *Id.*

Plaintiff testified that she could sit for "maybe 20 minutes" at one time, and then would have to "get up and walk around" because of the pain. TR 320. Plaintiff testified that her husband would help her lift things, that he would help her with household chores, such as making the bed and doing the laundry, and that he would help her with "everything." TR 321.

Plaintiff testified that she quit driving when she moved to Tennessee in 1999, out of fear that she "might run in the back of somebody not being able to brake." TR 321. Plaintiff also testified that she had cataracts in both eyes, but that her doctor had informed her that she would not need surgery right away. *Id.* Plaintiff testified that her ability to hear was not impaired, but

that she did hear voices at times.  *Id.*  Plaintiff reported that she would sometimes hear her deceased husband calling her name and that she believed that he was haunting her.  *Id.*

Plaintiff testified that she ate what she wanted, when she wanted.  TR 322.  Plaintiff testified that she usually ate a bowl of oatmeal for breakfast and then would eat "a good supper."  TR 322.

Plaintiff reported that she did not go out and that she only had one friend, who "gets on [her] nerves."  TR 322.

Plaintiff reported that she had once broken her arm, and that the doctor had limited her activity, but that "the case [was] still open," such that if she began having problems with it, the case could "be reopened."  TR 322-323.

**C.  Vocational Testimony**

Vocational Expert ("VE"), Rebecca Williams, also testified at Plaintiff's hearing.  TR 323-332.

The VE noted that as of her onset date Plaintiff was a person who was closely approaching advanced age, but that at the time of her hearing, Plaintiff was an older person of advanced age.  TR 325.  The VE also noted that Plaintiff had attained her GED.  *Id.*

The VE classified Plaintiff's past relevant work as a newspaper delivery driver as medium and semi-skilled, her past relevant work as an industrial cleaner for U.S. Tobacco as medium and unskilled.  The work of conveyor loader for a tobacco company was generally classified as medium and unskilled, but as Plaintiff described how she actually performed the job at U.S. Tobacco, it was light and unskilled.  The VE also characterized Plaintiff's past relevant work as a motel maid as light and unskilled, her past relevant work as a deli cutter and slicer at Wal-Mart as light and unskilled, and her past relevant work as a cook's helper at Wal-Mart as

medium and unskilled. TR 325-327.

The ALJ presented the VE with a hypothetical situation based on the limitations as set forth in page 4 of Exhibit 3F, the consultative examination performed by Eugene Smith. TR 171, 328. The ALJ asked whether, based on this exhibit, the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 328. The VE answered that the hypothetical claimant would be able to perform Plaintiff's past relevant work but would probably have difficulty working in the deli, because of her inability to work with the general public. *Id.*

The ALJ then presented the VE with a hypothetical situation based upon the limitations as set forth in Exhibit 4F, the Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment completed by Dr. Victor O'Bryan. TR 172-179, 328. The ALJ asked whether, based on this exhibit, the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 328. The VE answered that the hypothetical claimant would be able to perform Plaintiff's past relevant work, again with the same exception of work as the deli slicer. TR 328-329.

The ALJ next presented the VE with a hypothetical situation based upon the limitations set forth in Exhibit 7F,the Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment completed by Dr. Frank Kupstas. TR 190-199, 329. The ALJ asked whether, based on this exhibit, the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would be able to perform all of Plaintiff's past work. *Id.*

The ALJ then presented the VE with a hypothetical situation based upon the limitations set forth in Exhibit 8F, the Medical Source Statement completed by Dr. Robert Grummon. TR 329. The ALJ then asked whether, based on this exhibit, the hypothetical claimant would be able

to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would not be able to perform all of Plaintiff's past relevant work. *Id.* The VE also opined that no jobs existed in the national economy and the state of Tennessee that a person with the limitations assessed by Dr. Grummon could perform. *Id*.

The ALJ then presented the VE with a hypothetical situation involving a claimant of Plaintiff's age, education, and work experience, and asked the VE to assume that the claimant could perform a full range of medium work. TR 329. The ALJ asked whether, given this criteria, the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would be able to perform all of Plaintiff's past work. *Id.*

The ALJ then presented the VE with a hypothetical situation involving a claimant of the same age, education and work experience, and asked the VE to assume that the claimant could perform a full range of light work. TR 329. The ALJ asked whether, given this criteria, the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id*. The VE answered that the hypothetical claimant would be able to perform Plaintiff's past relevant work as a motel maid and deli slicer. *Id*.

The ALJ then presented the VE with a hypothetical situation involving a claimant of Plaintiff's aged, education and work experience, asked the VE to assume that the claimant could perform a full range of light work except that she required a sit/stand option. TR 330. The ALJ asked whether, given these criteria, the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id*. The VE answered that the hypothetical claimant would not be able to perform any of Plaintiff's past relevant work, but that there was other work in the national economy that a claimant with those limitations could perform. *Id.*

Specifically, the VE opined that in the State of Tennessee, there were approximately 4,000 jobs as a machine operator, 1,200 jobs as production assembler, and 900 jobs as an inspector, all of which would be appropriate for the claimant in the ALJ's last hypothetical. TR 330-331. In addition, the VE testified that nationwide, there would be approximately 200,000 jobs as a machine operator, 95,000 jobs as a production assembler, and 76,000 jobs as an inspector, all of which would likewise be appropriate for that hypothetical claimant. *Id.*

The ALJ then presented the VE with a hypothetical situation in which the hypothetical claimant had a severe or moderately severe mental condition. TR 331. The ALJ asked whether the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would not be able to perform any of Plaintiff's past relevant work and that there were no jobs in the state or national economy that she would be able to perform. *Id.*

The ALJ next presented the VE with a hypothetical situation involving a claimant with a non-severe, mild, or moderate mental condition. TR 331. The ALJ asked whether the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would be able to perform Plaintiff's past relevant work. *Id.*

The ALJ then presented the VE with a hypothetical situation in which the claimant had the same impairments and pain that restricts work activities as Plaintiff described in her testimony. TR 331. The ALJ asked whether the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. *Id.* The VE answered that the hypothetical claimant would not be able to perform Plaintiff's past relevant work, and that no jobs existed in the national economy that the hypothetical claimant would be able to perform. *Id.*

Plaintiff's attorney then asked the VE to clarify what skills would be required for the inspector positions that the VE identified as available. TR 332. The VE responded that the identified available inspector positions were unskilled and therefore no skills would be required. *Id.* Plaintiff's attorney also asked the VE to clarify whether those positions would have a sit/stand option, and the VE responded affirmatively. *Id.* Finally, Plaintiff's attorney asked the VE whether the inspector or production assembler positions could be done privately, *i.e.* not around other people. *Id.* The VE responded that those positions were often worked "in varying distances," where co-workers would be around, and "it might be within 10 feet and it might be within two feet." *Id.*

## III. CONCLUSIONS OF LAW

### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

**B. Proceedings At The Administrative Level**

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[5] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175,

1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by

relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule.

Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's

disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with

---

[5]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

## C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in assigning greater weight to Dr. Burr's evaluation of Plaintiff's condition than to Dr. Grummon's evaluation.  Docket Entry No. 14-2.  Plaintiff also contends that the ALJ erred by failing to consider all of the medical documentation in the record and subsequently finding that Plaintiff maintained the residual functional capacity to perform medium work.  *Id.*  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record

adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1. Weight Accorded to the Opinion of Plaintiff's Treating Physician**

Plaintiff maintains that the ALJ erred in according greater weight to the evaluation of Dr. Burr than to that of Dr. Grummon, Plaintiff's treating physician. Docket Entry No. 14-2.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Plaintiff argues that because Dr. Grummon is or was her treating physician, his evaluation should be given controlling weight. Docket Entry No. 14-2. Plaintiff specifically contends that there is "no indication that Dr. Grummon's analysis of [Plaintiff's] condition was based solely upon her statements." Docket Entry No. 14-2.

Dr. Grummon treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to his opinion than to the opinion of consulting examiner, Dr. Burr. Contrary to Plaintiff's assertions, however, Dr. Grummon explicitly wrote in his evaluation that the opinions contained therein were based on Plaintiff's own contentions (which the ALJ ultimately found to be less than credible). *See* TR 210-204. Dr. Grummon did not base his evaluation on his own treatment notes or findings; instead, he noted that each finding was based upon "Pt. Statement." *Id.* At the end of his evaluation, Dr. Grummon explicitly explained that his evaluation was based upon Plaintiff's statements because she "has a very positive review" of her symptoms and because he did not "have a gym or the time to test her assertions." TR 204. Because Dr. Grummon's notes on his evaluation directly contradict Plaintiff's

assertion, Plaintiff's argument on this point has no merit.

Moreover, Dr. Grummon's evaluation contradicted other substantial evidence in the record. The ALJ noted that while Dr. Grummon opined in his evaluation that Plaintiff could not work an eight hour day and "essentially [gave] a RFC for the bedridden and consistent with a nursing home occupant's abilities," that opinion was inconsistent with his own treatment notes and was contrary to other substantial medical evidence. TR 19. The ALJ also noted that Dr. Grummon's opinion was contradicted by Plaintiff's admitted daily activities. TR 17, 19. Furthermore, the ALJ noted that Dr. Grummon's opinion did not reference objective medical findings or diagnostic results, nor did the record contain objective medical findings or diagnostic test results that supported such an "exaggerated assessment." TR 19. Finally, the ALJ noted that Plaintiff's "substance abuse and questionable credibility strongly suggest her subjective complaints should not be depended upon too much," and that because Dr. Grummon explicitly based his opinions on Plaintiff's subjective contentions, his opinion would be assigned less weight. *Id.*

Instead of relying on Dr. Grummon's opinion, the ALJ chose to assign greater weight to the opinion of state agency physician, Dr. Burr, because Dr. Burr's evaluation was supported by substantial medical evidence, including treating physician clinical findings and mild to moderate findings on x-rays and MRIs. TR 19. The ALJ also noted that Dr. Burr's evaluation was consistent with Plaintiff's reported daily activities, and that as a state agency physician, Dr. Burr possessed a considerable understanding of the disability programs. *Id.*

As the Regulations state, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2). Instead, when there is

contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* Additionally, the Regulations state that the more relevant evidence a medical source presents to support an opinion, particularly medical signs and laboratory findings, the more weight the ALJ will give that opinion. 20 C.F.R. § 416.927(d)(3). The Regulations further state that the ALJ can consider the amount of understanding that a physician possesses regarding the disability programs and their evidentiary requirements when deciding the weight to give to a medical opinion. 20 C.F.R. § 401.1527(6).

Plaintiff "concedes that the record contains conflicting evidence regarding the severity of her back pain and the implications of this back pain for her residual functional capacity." Docket Entry No. 14-2. Plaintiff further concedes that it was "appropriate for the ALJ to consider the evidence within the existing record, weigh the evidence, and determine the weight to accord different items of evidence." *Id.* Because Dr. Grummon's opinion was admittedly based upon Plaintiff's subjective reports, which the ALJ deemed to be less than credible, because his opinion was unsupported by objective medical evidence, and because it was contrary to his own treatment notes, as well as the objective medical evidence of record, the Regulations do not mandate that the ALJ accord Dr. Grummon's opinion controlling weight. The ALJ's decision to assign greater weight to Dr. Burr's evaluation was proper. Accordingly, Plaintiff's argument fails.

## 2. Residual Functional Capacity

Plaintiff maintains that the ALJ failed to consider certain medical documentation that demonstrated the severity of Plaintiff's back injury, and that the ALJ subsequently erred in finding that Plaintiff retained the residual functional capacity to perform medium work. Docket Entry No. 14-2.

Residual Functional Capacity is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00©. With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

Plaintiff argues that the ALJ erred in finding that Plaintiff retained the residual functional capacity to perform medium work, because, in making this finding, the ALJ "failed to mention" certain radiology reports in determining the severity of Plaintiff's back injury. Docket Entry No. 14-2. Specifically, Plaintiff argues that the ALJ failed to mention the radiology reports of Dr. M.A. Todd and Dr. Jennifer Honcey. *Id.*

Contrary to Plaintiff's assertions, however, the ALJ's decision contains a substantial paragraph specifically discussing Plaintiff's back impairment, and specifically mentioning the radiology reports of Drs. Todd and Honcey. TR 14. The ALJ specifically noted:

> Regarding complaints of back impairment, lumbar x-rays and MRI performed in 2000, revealed "mild" degenerative changes at L4/5, a "mild" disc bulge and minimal change at L3/4 and L5/S1. In 2003, Darvocet was prescribed for six months to relieve back pain and thereafter, she received Ibuprofen and Flexeril. In 2004, Dr. Grummon performed an examination that revealed a non-tender spine, no muscle spasm and full range of back motion. Although there was no objective medical evidence of back instability, the claimant requested a back brace. In February 2004, the claimant specifically requested Darvocet, and in December 2004, treatment records revealed she was "happy" with Darvocet. Additional lumbar x-rays were performed, which showed degenerative change at

L5/S1 with no clear evidence of stenosis.[6]   In January 2005, a lumbar MRI showed multi-level degenerative change with "moderate" single level stenosis.[7] (Exhibits 8F and 9F) Based on substantial medical evidence, lumbar degenerative disc disease (DDD) will more than minimally impact upon her ability to perform basic work related activities and, as such, is considered a "severe" impairment.

TR 14 (footnotes added).

Because the ALJ's decision specifically references the records that Plaintiff asserts were not mentioned, Plaintiff's argument on this issue is without merit.

With regard to Plaintiff's argument that the ALJ erroneously determined that Plaintiff retained the Residual Functional Capacity for medium work, the record is replete with doctors' evaluations, medical assessments and test results, all of which were properly considered by the ALJ in determining Plaintiff's "residual functional capacity for work activity on a regular and continuing basis."  The ALJ, after evaluating all of the objective medical evidence of record and the claimant's level of activity, determined that Plaintiff retained the Residual Functional Capacity to perform medium work.  TR 21.  The ALJ properly evaluated the evidence in reaching this determination, and the Regulations do not require more.

Moreover, not only is the ALJ's determination that Plaintiff retained the Residual Functional Capacity to perform medium work supported by objective medical evidence, it is also supported by Plaintiff's own testimony regarding her range of daily activities, including *inter alia*, shopping, doing housework, cooking, and selling things at a flea market.  TR 16.  Because there is substantial evidence in the record to support the ALJ's Residual Functional Capacity determination, the ALJ's determination must stand.

---

[6]These x-rays were performed on December 30, 2004, by Dr. M.A. Todd, and are one of the reports that Plaintiff contends the ALJ "failed to mention."  TR 233.

[7]This MRI was performed on January 5, 2005, by Dr. Jennifer Honcey, and is the other report that Plaintiff contends the ALJ "failed to mention."  *See* TR 230.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Judgment on the Administrative Record will be DENIED, and the decision of the Commissioner will be AFFIRMED.

An appropriate Order will enter.

THOMAS A. WISEMAN, JR.
Senior United States District Judge